Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Judge Rosenbaum, I think you're muted. Thank you. Everybody has a role, that's Thank you. I appreciate it. As I was saying, good morning and welcome to the 11th Circuit. We're here today for the case of Geralds v. Attorney General of the State of Florida, case number 19-13562 and counsel, you may proceed. Good morning. May it please the court, on the denial of his petition for writ of habeas corpus. The district court granted DOA as to two issues and then this court expanded for an additional two issues. My intention is to address ground one and ground three and if there's any questions from the court on anything else or if I can get to it, I'm happy to address the other grounds as well. As to ground one, ground one is the Brady claim that was presented to the state circuit court and then appealed to the Florida Supreme Court. This court granted DOA as to particular items related to the claim and I'll just identify those quickly. There was an FDLE report by an analyst Ziegler, Shirley Ziegler, that indicated some of the serological testing that had occurred and the results of that. There were also, there was also another FDLE report by analyst Smith that addressed the hair analysis from hair that was collected at the crime scene as well as the victim's vehicle and compared to Mr. Gerald and it appears that some of it was compared to the victim. Then there are also Mr. Smith's handwritten notes that just have more detail about the about the comparison and so those are the three items that are before the court related to the Brady claim. The importance of these items, I think, is obvious because the state's theory at the trial was that Mr. Gerald, you know, had run into the victim sort of fortuitously at the mall and found out her husband was out of town. Then there was testimony that he had a conversation with the victim's son at the arcade and asked some questions about the comings and goings of the family that he then went to the house on February 1st, entered the home because he did know the victim. She allowed him in the home. There was a struggle. He ended up stabbing her and then rifled through things, took valuables, left the house in her car and left the car at school down the street and then proceeded to get rid of some of the things he had taken from the home. Can I ask you just a quick question? So I know your time is limited but to make sure that I understand the Brady argument that you're sort of really traveling under. In the briefs, I understood you to be making two arguments. One is that there's, you know, sort of the contrary to or a reasonable application of argument about the diligence aspect of the standard and then separately as to whether the state court's factual determination was unreasonable with respect to the fact of disclosure itself. Which of those two do you intend to focus on this morning or both? I guess I just sort of think we ought probably... This meeting is being recorded. I'll move right along then. So there were, as to the issue of diligence and whether that is not, Supreme Court. Both the Supreme Court and the district court imply or state that there is a diligence requirement on behalf of the defendant. And a review of the Brady cases starting Brady and going forward with Bagley and Aguilar and leading up more recently to Strickler and Banks make it very, very clear. I mean in Strickler and in Banks, the US Supreme Court sets out the prongs and there is no diligence prong. So can I ask you a quick question? So I think I do see where the district court seems to have imposed this diligence requirement, but I wasn't sure that I saw where the Florida Supreme Court imposed the diligence requirement. And of course our review under EDPA is ultimately of the state court's decision. So where in the Florida Supreme Court's decision does it impose the diligence requirement? I just saw it imposing the sort of, you know, the standard kind of tripartite requirement, favorable element evidence, exculpatory or impeaching, willfully or inadvertently suppressed because the evidence was material, the defendant was prejudiced. I just didn't see the diligence aspect in the Florida Supreme Court. It may be there. I might have dismissed it. Certainly the court did cite the Strickler standard. So they did cite the correct standard. But then if you start reviewing some of the issues, it's clear that, and I'm trying to find one just so that I can give an example. For example, I'm on page 789 of the opinion. They're talking about the photograph and in that particular case, they're saying it would have been made available to defense counsel. It wouldn't have been turned over. Well, that's asserting diligence on the defense. The photograph claim isn't before us though, right? Yes. I mean, I don't have, I'm trying to see where I mean, I, I'm sorry. I didn't, let me just move on and I will, uh, well, Would you address, would you maybe address, I mean, I think, I think we can look at that opinion ourselves, but would you address the issue of the fact finding what I've considered a fact finding that says that this stuff was turned over? Yes, sure. So, right. The fact finding that was made by the circuit court and then affirmed by the floor Supreme Court, um, relies primarily on the state attorney, Mr. Grammar, in that he says that whatever they got, they disclosed. And our position is that that's an unreasonable determination of the facts that were presented because in this case, the state presented or supplied, um, defense counsel with very detailed, uh, discovery disclosures and including the facts. So for example, if they turned over a report, they would list the name of the individual, uh, authoring the report, the date of the report and the number of pages of the report. So it was extremely detailed, um, that in addition to, uh, Jim Appelman, the state attorney at the time who was the lead counsel on the case said that the, those written disclosures were the best evidence of what was disclosed. So that undermines, uh, Mr. Grammar's testimony that if we got it, we disclosed it. Mr. Grammar also relied on his file thing. He had a folder in his file indicating that there were lab reports. And when he would pull, pull lab reports out, he would say this lab report, I have it. So I, therefore I gave it. And the problem with that is he also acknowledged that that, that his files had, were not intact the way they were at trial. He specifically identified a couple of things that had been added. And he also identified something that had been taken out, his handwritten notes. So the notion that the fact finding was made based on his, um, his indication that if it's in my file, I gave it, uh, again, was undermined by his acknowledgement that not everything in that file had remained intact. So there were specific things, um, along those lines also. And I don't, I don't think it's a, uh, much of a, we're not relying on it very heavily, but there was not that report. Those two reports were not in the trial counsel's file. Um, and that's the, both of the courts, sort of the circuit court and then the Florida Supreme Court, um, indicated that based on, um, Mr. Grammar's testimony that that, that trial counsel's file was not complete, but, um, that was only based again on Mr. Grammar's testimony that if he had it, he gave it. So there were— —Mr. Grammar's testimony, um, so I think it was, correct me if I'm wrong, but I think it was the testimony that he was the prosecutor who was in charge of making sure that things were turned over. That's right? It wasn't the prosecutor? Okay. And so he said, if we had it, we turned it over. Did the state court make a credibility determination that he was discreditable and that was right? I mean, they never say that it's a credibility determination, but I think implicit is that obviously they credited his testimony. Um, but again, if you look at the circumstances surrounding those reports and the fact that they're not listed, and I should just point out that that report by FDLE analyst Smith is issued four days prior to and there are submissions to defense counsel following, uh, the January 25th report. Jan Johnson, who's another FDLE analyst, issues a report on January 29th and that's disclosed in a specific disclosure with the date, her name, the number of pages. That's in the record. So the notion that these two reports, which happened to be, you know, significant reports and the questions that trial counsel's asking witnesses also appear that he does not know the information in these reports. And he's in the federal district court did note that, that some of his questioning seemed like maybe he didn't know that information. Can I ask you a question about that? And I sort of want to take you into the, um, this, the Strickland issue. I thought that I read in the record that, I mean, this goes to the prejudice prong, I guess, um, on the Brady. Um, but I thought that I read in the record that, um, the information about the hair was known to the, uh, to counsel because counsel had, uh, learned it during a deposition of a crime scene technician. Granted it's not the report, but it seemed like, is it not the same general information? And if it is the same information, where would the prejudice be? Um, that's the first question. The second question is, uh, if it indicates that he actually did know that and have that information, then that takes us to the next question, which is the Strickland question. So I've sort of built in a lot of questions there, but if you wouldn't mind going through them, that would be great. No problem. If I could just preface this by saying as to the Brady issue, um, it was pled in the alternative. So these particular reports are also should be considered, you know, Mr. Gerald submit under the deficiency and the prejudice analysis as well in that particular ground. So shifting over to that, um, so during the deposition of the crime scene analyst, um, or I'm sorry, the crime scene technician who was from Panama city police department, trial counsel starts asking him questions about what happened. Um, they, they get into the conversation because they're talking about the fact that he went and took the samples from Mr. Gerald and, uh, that leads, uh, trial counsel to ask, well, what's, what's happened with all these samples is there. And in that exchange, the, um, the crime scene technician says, oh, they just finished the hair analysis today, or, you know, within a few days and they just called and told me about it. And so he asks, is there anything that matches? And there's, there's some confusion about what the, the answer is no, but then, uh, trial counsel doesn't seem to really understand if he's talking about matches to Gerald's or matches something else, you know, from the scene. And, um, so there is some confusion there, but then the important key in that depo is trial counsel says, well, is this going to be in a report? And the crime scene technician says, no, he just told me it over the phone, which, I mean, obviously that trial counsel was on notice that there was this testing. And it seems that any reasonable trial counsel would follow up on this and not take the word of, you know, a crime scene tech who is not the person doing the analysis at FDLE. But, um, so there is some confusion there, but I agree that, that he should have known, trial counsel should have known, um, if there is a diligence requirement, then he certainly should have known. He knew that they went and took samples from his client, blood and hair and fingerprints and all those things. So he knew that there was analysis happening. And, um, so yes, if there is any diligence that is, you know, he should have taken, he should have went and tracked down the information. Um, the prejudice is that if you look at, it's not so much just that there wasn't anything that matched. I mean, there were dozens of hairs that were analyzed, hairs that were low, you know, were said to have been taken from the victim's left hand, um, you know, from her body, from the car, from places where, you know, this was allegedly a struggle. I mean, the state put that theory forward. This was a struggle. There was a fight. Um, and so these are the types of, this is the type of physical evidence and analysis that as a trial lawyer, you would want to know what it shows. Does it show that your client is there? Does it show someone else is there? Um, and in this case, you have just so much forensic evidence and trial counsel didn't seek out an expert on this, uh, didn't seek out an expert on anything other than a mental health expert. He was working independently when the guidelines at this time clearly stated there should be two qualified attorneys in capital cases. Um, he did not take depositions of any FGLE agent. Um, and he only took a handful of depositions. One of the depositions of witness Danford was taken seven days or four days before trial began. He just did not investigate and prepare for this capital case. Let me, let me ask you a question about Strickland. Um, and I'll just tell you, I think the Strickland claim is a better claim as between the Brady and the Strickland claim. Um, but my, my issue with the Strickland claim is that usually in a case where there are, where the argument is that the lawyer should have called witnesses, the witnesses that the lawyer should have called testify at the post-conviction hearing. But in this case, um, Ziegler, Smith, um, these, these, these people that prepared these reports were not called to testify at the post-conviction hearing. So how do we know what they would have said if a lawyer had deposed them or brought them in to testify as part of the defendants? Well, the reports in the notes speak for themselves. I mean, they are the conclusions of the examiner. They are the specific, um, details about the analysis. So there's, it's not necessary that you would put that particular expert on the witness stand in post-conviction, um, to reiterate what's in those documents. Well, I guess I, so Smith, if I understand correctly, correct me if I'm wrong, but Smith was on the prosecutor's witness list for trial, right? Yes. So, I mean, I don't know what he would say. I think it could be, I don't know what he would say if he were called, but apparently the prosecutor thought it would be favorable to the state. Well, the prosecutor admittedly told the post-conviction court that he didn't have the report at the time that he listed him. So he knew he was, he knew he had conducted the analysis and then he listed him. And then the next day was when the report was dated. So it's unclear when the state even got the report. He did have some facts copy in his file, but he said it wasn't, it didn't have a date that he could see on there when the facts came through. So I don't know if he did that in abundance of caution. He did put on the other, the other, uh, FGLA agents that were listed, I think barring one or so that did the fingernails, the reconstruction of the fingernail, but the other ones he did list and then he put on the witness stand. Um, but he did not put, he didn't put Smith on the witness stand, but I think that may be explained because he didn't have the report at the time. So the report, um, I've got two documents for Smith. I've got the typewritten report, which I can understand. And it says we tested the hair. It doesn't match the defendant. And then there are all these handwritten notes. Um, I mean, is there a difference as far as understanding the handwritten notes and the report? Is there something different about those? I think the microscopy is, um, some of it is, you know, in layman's terms in that it tells you the color of the hair, the, um, the cut of the hair, whether it was cosmetically treated is one of his characteristics that he identifies on some of the hair, um, the length of the hair. So there are things that are obvious. Uh, there are some other things he talks about, um, that might be less obvious to a lay person. There are, um, comments about, um, the, um, I'm trying to think the root, what the age of the root, is it telogen or is it antigen? So there are things like that, that, um, would not necessarily be obvious, but certainly, uh, you can go through and see he's distinguishing Mr. Gerald's hair from the hair. He usually writes a sentence about what was distinct about it. So there is, there are differences. Um, I think they only further, uh, bolster what he said in the report because he does conclude that nothing, nothing matches. And it also, uh, you know, is very precise as to where the hair is coming from. He's identifying that, but the report is, is okay in that sense. It just, I think that the bench notes are always more detailed in terms of what the examiner is seeing and writing down. So, you know, I don't know that there's any particular thing in there that's more, um, more prejudicial than the report would be in doing a prejudice analysis on the IAC side of it. But certainly, um, there are things in that report that trial counsel, you know, could have, could have done some things with, uh, had, or would be not just with the report with the notes. And that is why we did present the evidence of Mr. James, who was a, is a criminalist and has deals with all of these issues sort of like in the big picture. Um, he doesn't, his focus is the blood spatter, but he does understand all of these criminalistic type issues. And so he was, he did testify that these are significant forensic issues, the, the, where the hair is found, the fact that it doesn't match Gerald, um, those are, are forensically significant when you're looking at a crime scene. And so he went through each thing, he went through the blood, the serological analysis, he went through the hair analysis, and he went through the fingerprint and palm print and shoe print analysis and talked about how each one of those things in its own right is significant. Um, just one more quick question. What, so I just want to understand this, what is your theory about how the defense attorney would have presented this evidence? What do you think the defense attorney should have done to present this evidence? Assuming he got it? Sure. Well, I mean, the, I think the, um, the obvious thing was he could have put the witnesses on. He did, he did provide his own witness list where he said he was, uh, listing all of the state's witnesses. So that's the obvious course of action, I think. Um, but he could have also, you know, he did, he could have asked questions during the depositions if he had taken them, or, uh, you know, he could have tried to ask more questions during the trial and he just, he didn't ask these witnesses who were on the stand. For example, the, uh, Kenneth Hogue, who's the footprint analyst, also did the finger and palm prints. And it seems like it would be relevant and, uh, he could have asked those questions about other types of analysis that were conducted. So, um, I think that that, he could have also tried to go that route and he could have also had his own independent expert. So that I think there's multiple ways to do it. Um, and he, he didn't view any of them and it was to Mr. Darrell's detriment. I see that I'm into my, uh, rebuttal time. If I may reserve, I would appreciate it. Thank you, Castle. You'll, you preserved your full rebuttal time. We'll hear from Mr. Chappell. Am I saying that correctly? Yes, Your Honor. Good morning. May it please the court. I'm Assistant Attorney General William David Chappell and I represent the state of Florida in this case. This case arises from a murder which occurred over 30 years ago for which the defendant was convicted, charged, uh, to be charged, convicted, and subsequently sentenced to death. Uh, this morning we're here because the defendant is asking his court to overturn the decisions of the state post-conviction court, the Florida Supreme Court, and the federal district court, all of whom have denied his various post-conviction motions. With respect to the first issue, the state's position is that the defendant is unable to meet the burden under the AEBPA to overturn the state court decisions in this case. We have state court findings that the material, uh, evidence was, or excuse me, that the evidence in this case was both not material and that it was not suppressed. Counsel, I'm sorry to interrupt, but I want to direct your attention to the Strickland claim, if I could. Um, here's my concern on the Strickland claim. It seems like counsel's, counsel's argument, or what, for this particular case was, there's no evidence. The state did a shoddy job and there's just, there's no evidence. And, um, the state court said that was what his the fact that he argued that, why he would not have elicited evidence of that. I mean, it makes sense with respect to the fingernail because he used the fact that there wasn't evidence there to actually suggest that, um, that the fingernail belonged to another suspect as opposed to, uh, the victim here. But it doesn't make sense to me from the standpoint of much of such as, um, the fact that it turned out that there was the final testing of the blood on the shoe turned out not to return a positive test on that, or the fact that, um, can't care that was not Mr. Gerald's or the victim's was found in the victim's hand. All of those kinds of things, which are evidence that it doesn't add up that, you know, there's not, there's not enough evidence here that's consistent with his theme. Why, what is the strategy, any strategy behind not putting that information forward? Uh, yes, your honor. And I believe the answer to that question is actually the peculiarity of Florida law at the time that this case was tried. At the time that this case was tried, Florida law allowed for the state to present an initial closing argument. Defense counsel would then present a closing argument, and then the state would have the final say in a rebuttal closing argument. However, at the time that this case was tried, the defense attorney had an option to not put on evidence and not put on a case. If the defense attorney chose to do that, as happened in this case, then the defense attorney had the and the final rebuttal closing argument. And as the Florida Supreme Court notes in its opinion, that is a very powerful tool that a defense attorney has to take into account, especially in a case like this, where during closing argument, the defense attorney would be able to highlight the circumstantial nature of the state's case against the defendant. So in terms of the strategy, defense counsel had a choice. He could put on evidence of non-evidence as the Florida Supreme Court described the various materials that defendant alleges should have been put on, or he could try to do what we call the sandwich closing argument and try to highlight the circumstantial evidence of the state's case that way. That was the choice that he made and was certainly reasonable under the circumstances. And in fact, we have multiple state court findings stating that it was reasonable as well. So you look at this Strickland issue as whether to put on a, I mean, basically the defense attorney is saying, should I put on any witnesses at all or should I just rest on what the state did? That's the way you lead the strategic decision that the defense attorney may do. That's correct, Your Honor, especially because a lot of these issues that the defendant raises in this particular case were issues that were covered by the defense attorney during closing arguments and during extensive cross-examination of the various witnesses. The hair testing... Let me ask you about cross-examination because I think that may be an important issue because I think if we look at it as, I'll just tell you, I mean, I think if we look at it as a strategic decision to just not put on a case, then that's a really good position for you to be in. But is there not some of this evidence that could have been presented in cross-examination of witnesses that was not? Potentially some of the evidence may have been able to come in in terms of a cross-examination, but I still believe that the rule in Florida at the time required the defense not to put on evidence in order to take advantage of that double closing argument. So if the defense attorney speaking had put on any evidence with respect to that, it would have negated his ability to utilize that initial and final closing argument, which again would have allowed the state as well the opportunity to rebut any evidence that the defendant put on. And again, a good example of this would be the blood testing that was conducted. Defense counsel's own expert that was brought at the evidentiary hearing testified that a luminal test, which indicates a preliminary presence of blood, can use up all of the material in which a subsequent serological testing would not actually demonstrate blood. And that was something that the defendant's own expert testified to at the evidentiary hearing. So that is rebuttal evidence the state could have presented at trial. Instead, defense counsel in this case chose to bring up a lot of these issues in closing arguments in such a way that the state couldn't present rebuttal evidence. The state didn't have an opportunity to call experts to explain perhaps why none of the defendant's hairs or fingerprints were matched at the crime scene, and so was able to better articulate that the state's case was entirely circumstantial. The jury knew, answer something about the hair for me. It was my understanding from reading the record that the jury knew that the hairs found at the crime scene didn't match the defendant's. Is that right? Yes, your honor. That is something that was specifically articulated by defense counsel in closing. He mentioned the fact that the state had conducted multiple hair analyses, but failed to present any of those analyses to the jury. And he argued very specifically that that meant that none of the hairs could have matched the defendant. Otherwise, the state would have obviously put them on. And that goes to many of the issues. I mean, the same type of argument can be made with respect to many of the issues that the defendant now claims evidence should have been put on. All of these issues were put before the jury. So really, the defendant's argument in this case is that defense counsel should have argued things a little bit differently, as opposed to these are issues or arguments that were never presented to the jury. The jury, in fact, did consider all of these issues. All right, I guess in fairness to the defendant's position, not that trial counsel should have argued them differently, but should have put on affirmative evidence in support of them. But your response to that is, well, that would have opened him up to the reversal of the case. And so better to poke holes and get the benefit of the opening and rebuttal and closing than to be sandwiched in between. That is correct, Your Honor. Absolutely. And in addition to that, because we are under the AEDPS standards here, it's not just a question of whether or not defense counsel acted reasonably, but whether the state courts that have reviewed these claims have reasonably applied Strickland to this particular case. And I think under that doubly deferential standard, there's no possible way to conclude that the state courts got their decisions wrong or even that the defense attorney in this case acted unreasonably. Counsel, I may have just missed it. It's certainly possible. But I don't recall reading about the sandwich as a rationale in the Supreme Court's opinion or in the state court's opinion, but I may have just missed it. Can you help me out and tell me where I could find that? And if it's not in there, can you tell me what source of law would provide that? Yes, Your Honor. This is something that I actually realized after I filed my brief with the court, and I'd be happy to file a notice of supplemental authority with the relevant rule of procedure. It was not specifically referenced in the Florida Supreme Court opinions. However, the operative rules of criminal procedure for criminal procedure at the time do delineate the defense attorney's ability to do the sandwich closing argument. And I can provide citations and sources to that effect after the oral argument, that would be helpful. That being the case, can we rely on the idea of the sandwich here as far as edpedeference goes? That was not a particular finding with respect to the sandwich that was made by a state court. However, the state courts did reference the fact that closing argument is a very powerful tool, and the fact that that was the strategy the defense counsel had utilized. And in terms of evaluating whether or not the defense counsel performed the sandwich closing argument, you need only look to the transcripts for the initial trial proceeding, and they indicate very clearly that the defense counsel had two closing arguments at that point in time. But I believe that the factual findings for both the state post-conviction court and the Florida Supreme Court would still apply, even with respect to the sandwich closing argument, specifically because those courts utilized the finding that closing argument was a powerful tool, and that was clearly defense counsel's strategy. Now, it is a little bit more difficult in this case in terms of ascertaining what defense counsel's strategy was, because defense counsel was deceased at the time of the evidentiary hearing. But it's just an obvious review of the record that indicates what his strategy was in this particular case. Well, but in fairness, to Judge Rosenbaum's question, it sounds like you have two arguments about closing argument. One is the Florida Supreme Court found that closing argument is a powerful tool, and that the trial counsel here utilized closing arguments to poke holes in the state's case, and that's good enough. That's argument number one, and that may be enough for you. Argument number two is the argument you've presented today, which is sort of a turbocharged version of that, which is, oh, in addition to all of that, there's the sandwich phenomenon. But I think Judge Rosenbaum is asking, can you win—do you need to win on argument one, or can you really sort of infuse it with the sandwich phenomenon and try to get ad podefinence of that when the state courts didn't talk about that at all? Yes, Your Honor. To answer your question, I believe the state absolutely can win on argument one by itself, again, because the evidence that was allegedly there—the evidence that defense counsel did not present in this case, as the Florida Supreme Court found, was evidence of non-evidence. None of the evidence that could have been put on by defense counsel would have gone to exonerate the defendant in this case. All of the evidence would have merely implied that the defendant didn't leave any evidence at the scene. And as the Florida Supreme Court clearly articulates very thoroughly, the state's case was based on the testimony of the victim's children, who said they saw the defendant a week before the murder occurred at the mall, and particularly the victim's son, who testified about the very suspicious conversation the defendant had with him. In addition to that, the state's case rested on the fact that multiple witnesses identified the gold nebulas he pawned the day of the murder, hours after the murder occurred, as belonging to the victim, and that necklace had blood on it that was consistent with the victim's blood type and some additional enzymes. There's also testimony from the defendant's own grandfather that immediately after the murder occurred, the defendant had showed up at his home wearing gloves and immediately took a shower. He then apparently left and went to go visit a friend, where he gave that friend a pair of high-end red Gucci sunglasses, which were also identified as belonging to the victim. That was the state's case. None of the evidence that opposing counsel is suggesting the defense attorney should have put on in this case would have cut against any of the state's case. It was not material to what the state was arguing to the jury. Well, except maybe it was, right? Because if there was more than one person involved, or if there had been, you know, one person who executed and the other person who gave the plan and picked the person off, then Gerald could have either not been present at the house, because none of that circumstantial evidence, well, because we don't, the blood doesn't match up, the hair doesn't match up, etc. Or if he had been present at the house and somebody else had also been involved, you know, if the other person had been the one who actually killed the victim, a jury might not return a verdict of death, right? I mean, why isn't that not potentially material? Well, in this particular case, number one, the defendant never raised the issue of other people being involved until his re-sentencing proceeding, where he specifically identifies Mr. McGowan and Mr. Pelton, I believe, as the individuals who he claims is responsible. His defense of trial and original sentencing, he was just not involved at all in any case whatsoever. The defense attorney, I do believe, questioned Detective Jimerson about potentially other individuals, and Detective Jimerson clearly testified that all of the evidence clearly went towards the defendant being the culprit in this particular case. At no point in time has the defendant ever articulated any evidence whatsoever in any of the post-conviction proceedings that there was, in fact, anybody else involved with this particular crime that had occurred, and at no point in time has he offered an explanation for why he was in possession of the victim's necklace that had blood matching her blood type and additional enzymes, or why he had in his possession those red Gucci sunglasses. The only argument he was able to come up with in the post-conviction proceedings was that he but there was no testimony that the necklace he pawned the day of the murder was the necklace he bought from the pawn shop previously. So there's just no evidence in the record to suggest that anybody other than the defendant had anything to do with this crime, and none of the evidence of non-evidence, as the Florida Supreme Court put it, would have cut against the state's argument or otherwise supported the theory that other people were somehow involved with this and the defendant was just an accomplice. Can I ask you a question of this, and you may not know this because of the time when this murder happened, but would the death penalty still have been appropriate for someone who was an accomplice to a murder like this and took the jewelry when this murder happened under Florida law at the time? Again, because this murder occurred over 30 years ago, I'm not entirely sure. However, I believe that even at that point, Florida law would require a certain level of complicity with the murder in order for the death penalty to apply. If the defendant had hypothetically planned this with another individual, and they had planned to kill the victim, then absolutely the death penalty would apply. I believe there's case law suggesting that he was just like the driver of a getaway car sitting outside and didn't know that a murder was going to occur. Then the death penalty would not be appropriate. But again, there's no evidence here that anybody other than the defendant committed this particular crime, and additional circumstances. Except that maybe the reason there's no evidence is because counsel didn't put it on, right? I mean, we do know that there was a handful of hair that didn't match the defendant and didn't match the since we know there was a struggle. I mean, that strikes me as strange that there was at least a decent reason why a jury might think, if it knew that, that there was another person involved. Whether that was the only person involved or the primary person involved or the accomplice, that's a different question. But I don't think we can say there was no evidence that no one else was involved. Well, Your Honor, to address that, there's a couple of responses. First of all, that's the exact argument that the defense attorney made during the closing argument. He said the state took hair samples from the victim, from the defendant, and the hair samples that apparently they took were not presented to the jury, so somebody else must have been involved. So that is the exact argument that the defense attorney made. In addition to that, I think it's also important to note this case occurred, or this murder occurred over 30 years ago, and the testing that was done at that point in time involved microscopic analysis. There has, to my knowledge at least, there has not been any additional testing performed on those hairs. Obviously, 30 years later, technology is much better, much improved, but again, to my knowledge, the defendant has never asked for any additional testing on those hairs to be performed. So we don't know what additional testing might require, but because we are in post-eviction proceedings, the defendant absolutely has the burden of demonstrating and proving that he is entitled to relief. And he has not done that under typical post-eviction proceeding rules, nor has he managed to do that under the doubly deferential standard that the AEDPA imposes on this court. If there are no further questions from the panel, the state respectfully requests that this court deny the defendant's post-eviction claims and uphold the AEDPA standards in this case, and thank you very much for your time. Thank you, counsel. Ms. McDermott. Just thinking about the way the states presented or the respondents presented their case, I think that there's an error in the way that they are asking you to do the prejudice analysis. They're asking you to look at the evidence that was presented, and it's Mr. Jarrell's responsibility to somehow attack that evidence, and that certainly is possible one way of showing prejudice, but the other way is to show that confidence is undermined, and that you can do with evidence that was not within footsteps of where this victim was. There was a bloodied handkerchief with type O blood. There is simply, you don't need, and I shall say, Mr. Jarrell asked for DNA testing on the herringbone necklace, but you don't need DNA testing to know that that blood didn't belong to Mr. Jarrell. It didn't belong to the victim, and it's at the crime scene within steps of a violent encounter. There's fingerprint and palm print evidence. One fingerprint was so there was enough rich detail and things that they sent it off into the APHIS system to see if they could get a hit. This notion that Mr. Jarrell wore gloves has been, I mean, it is clear from the record that his grandfather said his gloves were driving gloves. His fingers were exposed when he saw him, so the fact that the respondent and the state attorney at the trial both have made this argument that there's, you know, his fingerprints weren't there because he was wearing gloves is just not supported by the record. Can I ask you just a quick question, because before we are on Strickland, before we get to prejudice, obviously, we've got to pass through performance, and it seems to me that that is where things are trickiest for you, because that's where you face the double deference, and so, you know, even setting aside the sandwich phenomenon, why is it unreasonable for the state courts to conclude that it was reasonable for the trial counsel here to make a vigorous closing argument where he poked holes in the death penalty cases where you get the feeling that the trial counsel just didn't do much of anything, and this isn't one of those. I mean, this is, you know, this is a pretty robust defense. It is, to be sure, it's in a defensive posture. The trial counsel didn't go on the offensive to present affirmative evidence, but it's a pretty robust defense, right? And I mean, the Florida Supreme Court went through sort of chapter and verse of the closing argument and said, you know, that it was a pretty robust defense and that that was good enough, and how is it under the standard that we can turn that around? Well, if you have a strategy, it always has to be a reasonable strategy, and when in Strickland cases, you're looking at information on a case-by-case basis, so you're looking at what the defense attorney had in his, you know, what was presented to him, what could found out, and then he's got to, like, make the decision as to what you do with that evidence, and in this case, there's just the notion that he would not have presented this exculpatory evidence. It was not non-evidence. It was exculpatory evidence. It would have undercut some of the inculpatory evidence, like the footprints at the scene, because he could have showed that, again, it tied into what he did argue, that there are many, many Nike footprints out there. There was one in the garage that was in paint. Somebody in the house obviously wore Nike shoes. So the notion that he didn't use this evidence and that the Florida Supreme Court characterizes it as non-evidence is just, it's unreasonable. Let me ask you a broader question that goes to Judge Newsome's question. Is there any case, any authority, where a court has said that a defense counsel is deficient for failing to put on evidence at the guilt phase and just arguing that the state hasn't met its burden? No, I have not found that case, but what I would say is with Strickland cases, we generally, because you're looking at the issues on a case-by-case basis, and there is such deference to strategic decisions, that you often do not find the same factual scenario that you have in a particular case. Well, but I guess my point is, isn't that case non-existent because 95 percent of criminal trials are where the defense attorney doesn't put on any evidence and just argues that the state hasn't met its burden? I mean, isn't that just generally viewed as the correct strategic decision in criminal defense? Well, I don't think it's necessarily de facto. There's no certain presumption that you wouldn't put on a defense, and I do want to point out that on February 2nd, you know, into the trial, trial counsel filed the witnesses in this case with numerous witnesses on it, one of whom was William Pelton, one of whom was Toyrak, the person who was one of them was Mark Gerald's aunt, Sheila Freeman, so there were people on there on this witness list. He clearly was contemplating putting on a defense case, but what's absent from this witness list is that he doesn't seem to put on any expert, you know, experts relating to the forensics. There's nothing relating to the forensics that he seems to be understanding was there. So let me ask you about, can I ask a question about the hair, which I think is a really important issue. Judge Rosenbaum said that there was evidence that the hair did not match Gerald's and also did not match the victim's, and I am looking at Smith's report, which I think is where that comes from, and all I see in the Tice report is where it says it doesn't match Gerald's. I know you say that in your brief too, so it has to be somewhere. Where did it say that it doesn't match the victim? Right, so if you're looking at these analyst notes, these bench notes, you're seeing that he does, there are times like when he's taking the, he took the pubic hair comings from the victim and he looked at both and he said it doesn't match Gerald's, it doesn't match the victim. That's the handwritten notes. Yes, right, and then if you're looking at the standards, they often do not come anywhere near the descriptions he's giving, and that's why I was saying that in some circumstances you do need to see those notes and they offer you a better understanding of the actual evidence, or you do need to take the deposition. You have to do something to be able to understand these comparisons. Yeah, and I agree with that, and I'll just tell you that's why it just bothers me that Smith never testified because I look at his handwritten notes and I can't even read them. I mean, I can try to figure them out, but I can read his written report that just says it doesn't match Gerald's, but I just have a tough time reading the handwritten notes. Well, if I have made an error in not calling him, then I would ask the court to remand, and I would tell you that I would happily conflict off this case because this evidence, and I see my time is running out, if I may just finish. Okay. This evidence is extremely powerful evidence that Mr. Gerald was not at that crime scene, and it comes in every single form in terms of what you would expect to see in a violent struggle with the fingerprints, the footprints, the hair, and the blood, and so I would ask this court in Burger v. Kemp's, the United States Supreme Court said that it's the duty of courts to search for constitutional error with painstaking care in capital cases, and so I ask this court to please do that in this case and to reverse the and or the death sentence. Thank you, counsel. We will be in recess, and we will take this case under advisement. Thank you.